## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARNI ZELNICK, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| TRUSTEES OF BOSTON UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Civil Action _____

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

1.   In 2023, Plaintiff Marni Zelnick was an Assistant Professor in Boston University's Film and Television Department in the College of Communication, and the Associate Chair of her department. That fall, BU sought to hire a new faculty member to dual roles as a Professor of the Practice in Professor Zelnick's department, and as department Chair. Professor Zelnick was qualified for the new position, and eligible to apply for it under BU's rules. She applied. The hiring committee evaluating candidates for the role ranked her first among the candidates and included her on the short list of candidates that it wished to invite for campus visits.

2.   Despite her qualifications, Dean Mariette DiChristina and Interim Provost Kenneth Lutchen removed Professor Zelnick from the search, over the objections of her current departmental Chair, members of the department, and the search committee.

3.   Less qualified male candidates with considerably fewer film credits, holding lesser academic appointments, were not removed, and were permitted to move forward in the hiring process.

1

4.  Professor Zelnick's removal from the search provoked considerable controversy within her department. In correspondence to the department's faculty and chair and in a meeting about the issue, she and others argued that her removal from the search was discriminatory. These emails were shared with Dean Mariette DiChristina and other members of the Dean's suite by Associate Dean Jodi Luber, a member of Professor Zelnick's department.

5.  Immediately after these exchanges, Associate Dean Luber and other allies of Dean DiChristina filed ethics complaints against Professor Zelnick, prompting a spurious investigation. BU kept the subjects and details of the complaints secret from Professor Zelnick, making it impossible for her to meaningfully respond or rebut the allegations, and assigned Senior Associate Dean Tammy Vigil, who openly disliked Professor Zelnick, as an investigator. Ultimately, the University removed Professor Zelnick as Associate Chair, depriving her of additional salary associated with that role. BU also used these events to deny or reduce Professor Zelnick's annual merit raise for the next two years.

6.  Through an internal complaint after these events, Professor Zelnick learned that the allegations against her were, essentially, that she had argued with others in her department about pedagogical matters, and that she had questioned a candidate too harshly during the chair search, when she asked him about his history of hiring women. Male faculty members, who had not complained of discrimination, had voiced similar disagreements in departmental discussions. Several had also asked chair candidates similarly hard questions. On information and belief, only Professor Zelnick was investigated or disciplined in the immediate aftermath of that conduct.

7.  Professor Zelnick made internal claims of discrimination and retaliation at BU following these events. BU's investigator essentially recited the rationales that BU decisionmakers

gave for their choices, and did not evaluate the substantial evidence that those rationales were pretextual.

8. Professor Zelnick continued to experience hostility at BU, with the result that she felt that she had no choice but to resign her position. She did so on August 15, 2025.

9. BU's treatment of Professor Zelnick was discriminatory and retaliatory, in violation of state and federal law, and caused her significant financial damage, reputational damage, and emotional distress.

## JURISDICTION AND VENUE

10. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; Title IX, 20 U.S.C. § 1681 et seq.; Mass. Gen. Laws ch. 151B; and the common law of the Commonwealth of Massachusetts, as hereinafter more fully appears. All conditions to jurisdiction under Title VII and Mass. Gen. Laws ch. 151B have been met, as described below.

11. This Court has subject matter jurisdiction over claims arising under federal law pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over claims under state law pursuant to 28 U.S.C. § 1367.

## PARTIES

12. Plaintiff Marni Zelnick is an individual residing in Pennsylvania.

13. Defendant Boston University ("BU") is an educational institutional with a business address of 125 Bay State Road, Boston, Suffolk County, Massachusetts.

## ADMINISTRATIVE EXHAUSTION

14. The Plaintiff filed a complaint of discrimination with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunities Commission on October 25, 2024. She withdrew her complaint on July 22, 2025 to commence this action.[1]

## STATEMENT OF FACTS

**Professor Zelnick's Professional History and Career at BU**

15. Professor Zelnick is an experienced and accomplished screenwriter and filmmaker. She has served in key roles on a slate of fiction and documentary projects, working with stars like Ed Harris, Winona Ryder, Catherine Keener, and Timothee Chalamet, among many others. She began making short films as early as 2000 and in 2010 a film that she produced was screened at the Cannes Film Festival. In 2012, she earned an MFA from NYU's Tisch School of the Arts—consistently ranked among the most prestigious film schools in the world. Her body of work includes films that have screened at Sundance, SXSW, Cannes, and Berlin.

16. Professor Zelnick began her academic career at BU in 2017 as an Adjunct Professor in the Film and Television ("FTV") Department at BU's College of Communication.

17. In 2019, Professor Zelnick was appointed as a Visiting Assistant Professor in the Screenwriting program for a year.

18. In 2020, Professor Zelnick was appointed as a non-tenure-track Assistant Professor in the Screenwriting program in the FTV Department.

---

[1] Professor Zelnick filed a second complaint of discrimination, covering events following October 25, 2024, on December 24, 2025, including her constructive discharge. She has not yet been able to remove that complaint from the MCAD because it has not yet been assigned to an investigating commissioner and 90 days have not passed since its filing. She intends to do so when possible, and to amend this complaint to assert a claim of constructive discharge. This Complaint recites facts relevant to that claim.

19. Professor Zelnick's work history and professional credits should have qualified her for appointment as an Associate or Full Professor of the Practice, a title used for faculty who have significant practical experience and credits in a field outside traditional academic research.

20. Appointments of non-tenure-track/untenured faculty at a lower rank than warranted by experience has been a persistent issue in Professor Zelnick's department, with the result that several faculty members have credits that would qualify them for significantly higher roles than those that they hold.

21. Professor Zelnick teaches in both the Screenwriting and Production programs within the FTV Department, attends faculty meetings for both programs, and has extensive experience in both fields.

22. Professor Zelnick has been extremely effective and successful as a professor at BU. Her record as a faculty member demonstrates her whole-hearted commitment to her students, to her department, and to the University as a whole.

23. Professor Zelnick developed a three-part course in Social Purpose filmmaking. In November 2023, a film from this class won the Director's Guild of America award for Best Asian American Student Film—the first DGA award in BU's history, and among the most significant awards a student film can win. In 2024, that success was repeated when a film from her class won yet another DGA award. Films from this course won first and second place at BU's own Redstone Film Festival in the Spring of 2023, and also took home all three short screenplay prizes in the Fleder-Rosenberg contest. Professor Zelnick's record of fostering student success is unmatched among her peers.

24. Professor Zelnick's teaching evaluations are consistently excellent.

25.  Professor Zelnick has devoted a tremendous amount of time and energy to service to the University, including serving on four search committees in two departments, hiring a total of six new faculty; organizing BU's first set safety seminars for production students; drafting intimacy guidelines and serving as the intimacy coordinator for student productions; and starting a feature screenplay contest.

26.  In July 2022, Professor Zelnick was appointed as Associate Chair of the Film and Television Department.

**The 2022 Chair Search**

27.  In 2022, Professor Paul Schneider, then the Chair of the Film and Television Department, announced his intention to retire at the end of the 2022-2023 academic year.

28.  Most department chairs at BU are elected internally and have no leadership experience prior to being elected by the faculty in their department to serve as chair. Many leaders in university administration begin their careers that way, including the two male prior Chairs of the FTV department, Professor Schneider and Professor Charles Merzbacher.

29.  No woman has ever been appointed Chair of the Film and Television Department at Boston University—nor of *any* academic department in BU's College of Communication.

30.  Professor Schneider's imminent departure prompted an inquiry among other members of the department's faculty regarding their interest in serving as Chair. Initially, no faculty member in the department was interested in serving as Chair.

31.  In the absence of any other candidate within the department, Professor Zelnick expressed that she was willing to serve as Chair. She presented an assessment of the department and her vision for the future to her colleagues. Following that presentation, the faculty voted unanimously in favor of her election as Chair.

32. When Professor Zelnick's election was sent to the Office of the Provost for approval, then-Provost Jean Morrison responded that only faculty at the Associate rank or higher could serve as Chair.

33. The faculty as a whole was disappointed by Provost Morrison's decision.

34. Professor Zelnick accepted Provost Morrison's decision. In the absence of an internal candidate for Chair who was acceptable to the Provost's Office, the University conducted a full open search for external candidates.

35. Four candidates were identified in the final round of the 2022 search and brought to BU for campus visits that included presentations to and meetings with the FTV faculty.

36. Of those four candidates, two had fewer production credits than Professor Zelnick. She was struck by how similar the qualifications of many of the final candidates were to her own, which Provost Morrison had deemed insufficient.

37. At this point Professor Zelnick discussed her concern that her title did not accurately reflect her experience with the department's Chair. Professor Schneider told her that, as was standard practice, she was free to apply to any open position advertised by the department at any time, provided the advertised position was not in the exact same line she currently held (i.e. unmodified Assistant, Associate, or full Professor in Feature and Television Writing).

38. The 2022 search identified one very qualified candidate. With broad support among the FTV faculty, that candidate was offered a faculty position and the role as Chair, but he removed himself from the search for personal reasons at the last minute. The search failed and no one was hired to take on the role of Chair.

39.   Professor Schneider agreed to continue to serve as Chair through the 2023/2024 academic year.

**The 2023/2024 Chair Search**

40.   In the fall of 2023, BU began a full open search for external candidates for the Chair position. BU advertised an open position as Professor of the Practice in the Production program, with an appointment as FTV Chair. The posting specified that the position was a "non-tenure track appointment with an initial three year, renewable contract." The posting did not require applicants to hold any specific academic rank or specify years of experience either in academia or in the film industry.

41.   At BU's College of Communications, Professor of the Practice is a "modified" title, relying on practical experience rather than on, for example, academic studies or publications.

42.   Professor Zelnick applied to the open role.

43.   BU policies permit current faculty to apply to open positions so long as they are in a different line from the faculty member's current position. (Faculty cannot apply to open positions in their current line in lieu of promotion.) Because Professor Zelnick was an Assistant Professor in Feature and Television Writing, and held an unmodified title of Assistant Professor, under BU policy she was eligible to apply to the open position with a modified title of Professor of the Practice in Production. Professor Zelnik has substantial production credits in addition to her credits as a screenwriter, and was qualified for the advertised position.

44.   BU disseminates training materials to its search committees that dictate that internal candidates should be evaluated the same way as external candidates, regardless of their

current titles within BU. Professor Zelnick, who had served on many search committees that followed that principle, reasonably expected that her qualifications for the open position would be evaluated in the same way as those of outside candidates, regardless of her current title.

45.    The College of Communications has a standard process for hiring. In that process, when a department has an open line, it convenes a search committee, which then uses a hiring matrix to anonymously rank candidates based on characteristics deemed important in the role to be filled.

46.    The use of matrices is required by the College of Communications to reduce preconceptions and bias and focus on candidates' objective qualifications for a role.

47.    The FTV Department convened a Search Committee to evaluate the candidates for the position that it advertised (Professor of the Practice in Production, with appointment as Chair), composed of five members of the FTV department.

48.    The Search Committee used matrices that reflected the following criteria and weightings, drawn from the job posting:

- The candidate is a distinguished practitioner in film/television whose record of accomplishment leads to international or as appropriate national reputation. 25%

- The candidate has an understanding and appreciation for our department and innovations to keep pace with the industry changes, along with a vision for our future. 25%

- The candidate is familiar with and has an appreciation for curriculum design, assessment, budgeting, and day-to-day operations of a university program or the film and television industry. 20%

- The candidate has demonstrated accomplishments in promoting diversity and inclusion in an organization. 15%

- The candidate has a commitment to a wholistic film and television education, including production, studies, screenwriting, and the evolving media landscape. 10%

- The candidate has a master's degree or equivalent experience. 5%

49. Using these matrices, the Search Committee ranked Professor Zelnick first among the candidates who applied for the position.

50. As the search was ongoing, Professor Schneider reached out to Dean DiChristina about whether then-Interim-Provost Kenneth Lutchen would have problems approving Professor Zelnick for the position as advertised. He noted Professor Zelnick's professional experience in production. He also asked if it might be possible to alter the faculty title to Associate Professor of the Practice. Dean DiChristina raised concerns about both possibilities.

51. Dean DiChristina then reached out to the Search Committee and told them that they must remove Professor Zelnick from the search.

52. Search Committee Co-Chair Sheila Sitomer was troubled by Dean DiChristina's directive to remove Professor Zelnick, which was seemingly in violation of university procedures outlined during search trainings. She was also distressed at losing the person she and the committee agreed was the strongest candidate in the pool. She expressed her concern to at least one FTV colleague who was not a member of the Search Committee. This faculty member was also disturbed and suggested they call an emergency meeting of the entire

FTV faculty to let them know what was happening. At this meeting, the FTV faculty voted

unanimously to seek a meeting with the Office of the Provost.

53.   The FTV faculty sought a meeting with Associate Provost for Faculty Affairs Maureen

O'Rourke "to consult with you on the university's policy with respect to faculty titles."

Their letter to Associate Provost O'Rourke read, in part:

> We sometimes encounter candidates who are high-level practitioners in a
> particular sector of the media industry but have also occupied lower-level
> academic appointments. Perhaps they held an entry-level faculty position before
> embarking on their professional career, or were teaching part-time, or took an
> appointment teaching in a discipline other than their primary area of attainment,
> or accepted a position at a certain rank because it was the only one available at the
> time.
>
> We are seeking confirmation that, just as we are able to put forth highly qualified
> professionals with little teaching experience for full Professor of the Practice
> positions, so too can we put forth highly qualified professionals who have held
> junior teaching posts and/or academic titles at the high school or university level.
>
> While the logic of this proposition seems straight-forward to us, enough questions
> have been raised about the assessment of professional candidates' academic
> credentials to put the outcome of at least one crucial faculty search at risk. We are
> therefore asking that you meet at your first convenience with a delegation of our
> faculty with the aim of settling the university's policy on this issue.

54.   A meeting did take place between Associate Provost O'Rourke and a delegation from the

FTV department's faculty. Professor Zelnick was not present at the meeting. After the

meeting, the Search Committee proceeded with Professor Zelnick still included as a

candidate in the Chair search.

55.   The Search Committee proceeded to conduct interviews via Zoom with candidates for the

open position, including Professor Zelnick.

56.   Following the interviews, the Search Committee again used matrices to rank the candidates

for the position. Again, Professor Zelnick was the most highly ranked.

57. In December 2023, the Search Committee identified four candidates, including Professor Zelnick, that they wished to invite to make campus visits to meet with the FTV faculty and make presentations regarding their visions for the department.

58. On December 21, 2023, while the faculty were on winter recess, Interim Provost Lutchen and Dean DiChristina met and agreed to remove Professor Zelnick from the faculty search.

59. Dean DiChristina communicated this decision to the Search Committee and to Professor Schneider. She claimed that if she were Chair, Professor Zelnick would be vulnerable to pressure from senior colleagues due to her lower rank as an assistant professor—ignoring the fact that if she were hired for the advertised position, Professor Zelnick's rank would change and she would no longer be an assistant professor. She wrote to the Search Committee, "Please remove [Professor Zelnick] from further consideration."

60. On or about January 3, 2024, Search Committee Co-Chairs Sheila Sitomer and Charlotte Howell informed Professor Zelnick that, at Dean DiChristina's direction, she was being removed from the search.

61. One member of the Search Committee, Jan Egleson, immediately resigned in protest regarding Professor Zelnick's removal and lack of consultation with the committee as a whole about that decision.

62. BU Administrators did not subject male candidates for Chair to the scrutiny that they applied to Professor Zelnick's candidacy.

63. Interim Provost Lutchen's choice to remove Professor Zelnick from the search was unprecedented; no provost had inserted themselves into the Department's hiring process in this way in recent history.

64. Dean DiChristina and Interim Provost Lutchen approved three candidates for further consideration (Amedeo D'Adamo, Damon Lee, and Lesley Norman). Two of three were male.

65. None of the candidates who were permitted to go forward had credits in the field that were even close to Professor Zelnick's.

66. Mr. D'Adamo was then a lecturer at the American Film Institute, a lower academic rank than Professor Zelnick held at BU. He held a leadership role as Associate Dean for Academic Affairs, but had held that role only since March 2023. In contrast, Professor Zelnick had served as Associate Chair of the Film and Television Department at BU since July 2022. Like Professor Zelnick, his previous academic experience was as an adjunct faculty member. His only prior managerial experience was with the Los Angeles Film School, which ultimately became the subject of multiple lawsuits alleging that it made false claims about work placement and graduation rates and maintained its accreditation through deception. He had only two film credits on his CV, neither of which has any distribution on any channel or service.

67. Mr. Lee had no previous full-time academic employment at any institution. He had limited experience as an adjunct faculty member at Brandeis, where he taught one course on film genres, and UCLA. He is the CEO of his own production company, Deacon Entertainment, which specializes primarily in marketing materials. His work in independent film is primarily as an Executive Producer.

68. Ms. Norman had no previous academic experience. She held a master's degree in Broadcast Journalism and had a long career as a finance executive in Public Television working in non-fiction docuseries (work that might have been relevant to the College of

Communications' separate Journalism department but that was not particularly relevant to the subject matter that FTV teaches).

69. Following their visits to campus, the FTV Department gave the Search Committee overwhelmingly negative feedback on all three of the remaining candidates that Provost Lutchen and Dean DiChristina approved for visits to campus.

70. Had Professor Zelnick been permitted to remain in the search, it is nearly certain that she would have been the successful candidate.

71. With no remaining finalists, the Search Committee proposed a new male finalist, Craig Shepherd, who had been removed from the search in a prior round and had consistently ranked significantly lower than Professor Zelnick at every stage of evaluation. He was ultimately hired.

72. Professor Zelnick was told by Chair Paul Schneider that she needed to support this candidate or she risked losing her job.

73. The successful candidate had no academic title or experience at all.

**Fallout from Professor Zelnick's Removal from the Search and Discrimination Complaints**

74. On January 9, 2024, Professor Zelnick wrote to Professor Schneider and told him that her removal, while Mr. D'Adamo remained in the search, seemed like "a classic case of gender discrimination where the bar is higher for me for no apparent reason."

75. The FTV faculty were outraged that Professor Zelnick, who had twice scored highest on the Committee's hiring matrix, and had the support of the faculty, was not approved as a finalist. Faculty members demanded a meeting with Dean DiChristina, which took place on January 12, 2024 without Professor Zelnick or the Search Committee in attendance.

76.  Members of the faculty who attended the meeting reported to the rest of the faculty, via email, that the meeting was tense, and that Dean DiChristina was not willing to discuss the merits of the Provost's decision. Three members of the faculty directly expressed their concern that Professor Zelnick's removal from the search was the result of gender discrimination. Dean DiChristina refused to comment on their concerns.

77.  After their unsuccessful meeting with Dean DiChristina, the faculty discussed whether to request a meeting with Interim Provost Lutchen. Ultimately, a majority of faculty voted to request a meeting. Professor Schneider emailed Interim Provost Lutchen, who responded that he would not meet and that his decision was "non-negotiable."

78.  On January 15, 2024, Professor Zelnick wrote to the FTV faculty and its Chair, Professor Schneider, that she had concerns about discrimination in the search, writing, "Twice I have been ranked by the Search Committee at the top of the pool, and twice I have been removed prematurely. Right now, I stand removed while a white, male candidate with fewer credits remains in the pool."

79.  Among the recipients of this email were Professor Jodi Luber, who is also an Associate Dean. As a member of the Dean's Suite, Dean Luber reports to and works closely with Dean DiChristina.

**Retaliatory Complaints Against Professor Zelnick**

80.  Unbeknownst to Professor Zelnick, on January 10, 2024—the day after her email to Professor Schneider alleging that her removal from the Chair search was gender discrimination —an anonymous EthicsPoint complaint was filed against her, claiming that she had "publicly dress[ed] down and sen[t] threatening emails to those who voice disagreement or 'question'" her authority. This complaint appeared to reference email

correspondence between Professor Zelnick and Professor Scott Thompson from November 2023, in which they disagreed about curriculum questions. On information and belief, this complaint was filed by Associate Dean Jodi Luber.

81. Professor Thompson is the head of the Screenwriting program, and Professor Zelnick's direct supervisor, with authority over what classes she teaches and when.

82. The January 10, 2024 complaint also claimed that Professor Schneider did not appropriately control Professor Zelnick's behavior.

83. In reality, Professor Zelnick did not in any way, at any time, threaten Professor Thompson.

84. In September 2023, Professor Thompson was combative at a September Zoom meeting with the production curriculum subcommittee, which included Professor Zelnick. After the meeting, the four subcommittee members discussed his behavior, which was notably aggressive.

85. Professor Thompson's combative behavior reoccurred at a November faculty meeting discussing the proposed curriculum changes, to which he was resistant.

86. These incidents prompted the email exchange that was the subject of the complaint, in which Professor Zelnick expressed frustration that some faculty, including Professor Thompson, were dismissive of the work that she and her colleagues had done on their proposal for curricular changes. Professor Zelnick was not abusive or inappropriate in that exchange; she exercised her academic freedom to express an opinion about core academic questions.

87. This exchange took place in November of 2023 but no complaint was filed at that time and Professor Zelnick and Professor Thompson continued to interact normally after their exchange on campus, at Screenwriting program meetings, via email, and at social events

16

88.     At a faculty meeting in January, Professor Thompson told FTV faculty that he met with
        Dean DiChristina independently after the faculty met with her via Zoom on January 12,
        2024, and told her that he thought that their use of the word "discrimination" was going too
        far.

89.     On January 15, 2024, the same day that Professor Zelnick emailed her colleagues to
        express her concerns about discrimination in the Chair search, Associate Dean Jodi Luber
        filed a second EthicsPoint complaint against Professor Zelnick, referencing Professor
        Zelnick's contentious email exchange with Professor Thompson (which, again, had taken
        place months before). Dean Luber's complaint makes it clear that she had not actually seen
        the email exchange and therefore could not have evaluated the content of Professor Zelnick
        or Professor Thompson's emails.

90.     Dean Luber's EthicPoint complaint references Professor Zelnick's complaint about
        discrimination in the Chair search, writing, "It should be noted that the author of the email
        is campaigning to become the next Chair of our department and this effort has created deep
        divisions at COM, *including an unwarranted and nasty effort to demean Dean
        DiChristina*." (emphasis added).

91.     On January 16, 2024 Dean Luber compiled internal emails of the FTV faculty, including
        Professor Zelnick's January 15, 2024 email complaining of discrimination and emails from
        other faculty recounting the meeting in which they raised concerns about discrimination
        with Dean DiChristina directly, and sent them to Senior Associate Dean Tammy Vigil. The
        subject of her email is "FW: Meeting with Mariette re Chair Search" and the first line of
        her email reads, "For our meeting at 11." The specific section where Professor Zelnick

talks about her concern regarding discrimination was highlighted in the margin presumably by Senior Associate Dean Vigil.

92. On February 8, 2024, a third EthicsPoint complaint was filed anonymously, claiming that Professor Zelnick asked candidates for Chair overly challenging questions during their visits to campus.

**BU's Sham Investigation of Professor Zelnick**

93. All three complaints were forwarded to Interim Provost Lutchen, who in turn provided them to Dean DiChristina. He asked that she "start with Marni and explain that this was submitted with [sic] attribution and want to talk it through with her. Etc. Let me know how this goes and if/how she and you decide to address."

94. Instead of having the conversation with Professor Zelnick that Provost Lutchen suggested, Dean DiChristina appointed Senior Associate Dean Tammy Vigil to conduct an investigation.

95. Dean Vigil had never conducted an investigation before and had no training or experience in how to do so.

96. But Dean Vigil did have a history of treating Professor Zelnick with open hostility. When they served together on the Tenure and Promotion Task Force, Dean Vigil was openly disagreeable to Professor Zelnick. As a leader of that task force, Dean Vigil sought to implement a rule that would bar Professor Zelnick from serving as Associate Chair.

97. Dean Vigil also openly voiced her dislike of Professor Zelnick to Professor Schneider. Professor Schneider wrote to Dean Vigil privately at the time that he, and others on the committee, were disturbed by the tone of her messages to Professor Zelnick.

98.    On February 21, 2024, Dean DiChristina wrote to Professor Zelnick to tell her that the University had received "allegations" that she had engaged in unprofessional behavior directed toward faculty and staff, and had created a working environment characterized by efforts at intimidation and coercion. The letter stated that the three complaints provided "specific examples" of alleged misconduct, but it did not attach the complaints or provide Professor Zelnick with any examples. These details were not provided to Professor Zelnick at any point during BU's investigation of the complaints. At the end of the process, Professor Zelnick still did not know what conduct BU was investigating.

99.    Given the contentious Chair Search and Dean Vigil's past behavior toward Professor Zelnick, both Professor Zelnick and Professor Schneider independently objected to having the Dean's office conduct the investigation, and requested independent investigators. Dean DiChristina and Interim Provost Lutchen denied the requests.

100.   On information and belief, Dean Vigil's investigation was biased and the outcome predetermined.

101.   Dean Vigil refused to review easily available exculpatory evidence and did not interview witnesses that Professor Zelnick identified.

102.   Dean Vigil interviewed Professor Zelnick only once. During that interview, she asked only four questions: (1) "How would you describe your communication style?" (2) "Does your communication style change when you take into account your role in leadership?" (3) "How do you handle conflict or conflicting styles of communication?" and (4) "Have you ever encouraged Paul to intervene on your behalf or take an action you are advocating that others disagree with?"

103.  After Professor Zelnick answered those questions, Dean Vigil told her that the accusations against her fell into four "baskets." Three of the four "baskets" amounted to allegations that she was discourteous to faculty or staff when disagreements arose. Dean Vigil refused to share any details or alleged instances of such purported misbehavior. The fourth "basket" contained allegations that Professor Zelnick had disrupted departmental searches, apparently referencing questions that Professor Zelnick posed to candidates for Chair during their campus visits after she was removed from that search.

104.  While refusing to share details of the complaints, Dean Vigil asked Professor Zelnick if she could think of any reason faculty or staff might have filed complaints. Professor Zelnick said that she could not. Dean Vigil suggested that Professor Zelnick think of her service on committees, including on a DEI committee. Professor Zelnick was not aware of any complaint about her committee service.

105.  Professor Zelnick provided Dean Vigil with documentation that following her service on the DEI committee, its Chair wrote to thank her and requested her further service.

106.  Professor Zelnick identified numerous witnesses who could speak to the nature of her behavior on committees on which she had served. Dean Vigil interviewed only a single one of those witnesses.

107.  Professor Zelnick racked her mind trying to recall every disagreement with a colleague that could possibly have provoked a complaint, and provided Dean Vigil with all of her email correspondence related to every dispute.

108.  That email correspondence showed that Professor Zelnick had, on occasion, disagreed with colleagues about departmental matters, and spoke her mind.

109.  In addition to the disagreement with Professor Thompson over curriculum reform, the correspondence showed that Professor Zelnick had rightfully intervened to prevent Associate Dean Jodi Luber and a colleague from violating search procedures in an attempt to hire their friend on a search committee for a Master Lecturer in Producing on which both Luber and Zelnick served.

110.  The correspondence also showed that even when disagreeing with others, Professor Zelnick was consistently professional and never resorted to profanity, personal attacks, or otherwise inappropriate language.

111.  Zelnick's language and tone in the correspondence was essentially comparable to that used by the male faculty members with whom she was disagreeing.

112.  Professor Zelnick did ask some of the candidates for Chair challenging questions, but believed that they were legitimate and important for the candidates to address.

113.  Professor Zelnick's male colleagues asked similar and, in some cases, even more challenging questions during the interviews of the Chair candidates.

114.  The candidates' presentations and the questions that faculty asked following the presentations are well documented, including by video.

115.  Professor Zelnick asked Dean Vigil to review the videos and transcripts of the questions asked, which would have proved that she acted reasonably and professionally, and that male faculty asked equally difficult questions. Professor Zelnick even provided Dean Vigil with a document listing the time-stamps where the exchanges in question took place.

116.  Professor Zelnick's exchanges with candidates were the primary subject of one of the three complaints against her. Dean Vigil was provided with videos of these exchanges, but did not attach the videos or transcripts to her report.

117.  One candidate, Damon Lee, gave a "vision" presentation to the Department that focused in part on his commitment to diversity. He included a statement that "diversity too often is only about Black people. I want to make sure that we're bringing in more women."

118.  In the following question and answer period, Professor Zelnick asked Mr. Lee about his own history of hiring women. She pointed out that IMDb suggested that he had never hired a woman as a director or a cinematographer, noted that she saw a lack of women in key roles on his projects, and asked if he could speak to that. He responded that in fact he had hired a woman (one) as a cinematographer and that he had worked for many women, and was "all about" hiring women; he also spoke generally about his commitment to diversity.

119.  In the video of Mr. Lee's presentation, Professor Zelnick's tone is mild and entirely appropriate. Mr. Lee is defensive, repeatedly cutting her off.

120.  Mr. Lee complained, following the exchange, to Professor Schneider, who chastised Professor Zelnick.

121.  Male faculty who asked similarly difficult questions were not investigated or disciplined. For example, Professor Gustavo Rosa asked Mr. Lee about his awareness of global cinema, and about his history of working with primarily white crew members rather than a more diverse crew. Professor Schneider similarly chastised him by email, but BU took no further action at that time.

122.  Unsurprisingly, given Dean Vigil's bias and selective investigation, Dean Vigil issued a report finding Professor Zelnick responsible for misconduct.

123.  Dean Vigil's report frequently used language with gendered overtones to describe Professor Zelnick's supposed misdeeds, such as that she is "too aggressive" when speaking

up or asking questions, or that Professor Schneider fell for her "charms" allowing her to "manipulat[e]" him.

124. Dean Vigil's report repeatedly discussed Professor Zelnick's perceived character rather than conduct, relying on claims about her demeanor or others' fears about how she would act, rather than finding instances of actual misconduct.

125. Dean Vigil's report repeatedly described normal academic behavior as though it were misconduct. For example, she wrote that Professor Zelnick's "use of evidence is a 'weaponization of information' intended to limit dialogue and undermine dissent"—an astonishing statement for an academic leader to make.

126. Professor Zelnick could have convincingly rebutted many of the factual allegations in Dean Vigil's report if she had been informed of the allegations and able to offer evidence about them.

127. On April 23, 2024, Dean DiChristina wrote to Professor Zelnick that the allegations "that you engaged with colleagues in an unprofessional and disrespectful manner, engaged in behaviors that created a hostile work environment for colleagues, and inappropriately disrupted the Department Chair search process, including behaving inappropriately toward external candidates for the position, have been substantiated."

128. In her report, under "Policies Applicable to Investigation," Dean Vigil wrote, "n/a".

129. Dean DiChristina stripped Professor Zelnick of her position as Associate Chair of the Department, and of the stipend associated with that role, as a sanction for her supposed misconduct.

130. Dean DiChristina also used the investigation's findings to reduce Professor Zelnick's merit raise to zero for Spring 2024.

131. In contrast to Professor Zelnick, Professor Rosa, who was also scolded for harsh questions to Chair candidates, received a glowing annual review and substantial merit raise in Spring 2024—the same semester Professor Zelnick was demoted and her merit raise cut to zero.

132. Dean DiChristina refused to provide Professor Zelnick with a copy of Dean Vigil's report substantiating the allegations.

133. At the end of the investigation, Professor Zelnick still did not know who had complained about her; the substance of their complaints; or what evidence the University relied on to find her responsible. She never saw or had any opportunity to respond to the evidence against her.

134. Boston University never identified any policy that Professor Zelnick allegedly violated, and on information and belief, no BU policy forbids faculty from strenuously disagreeing with each other.

135. BU has a policy on Academic Freedom that provides that "Controversy is a normal aspect of free academic inquiry and teaching, and it is proper to incorporate both the knowledge and the beliefs of the faculty member into that which is taught." The only condition imposed by this policy is accuracy: "The faculty member is likewise entitled to freedom in teaching and discussing the subject matter. Yet, as in research, the concomitant of this freedom must be a commitment to accuracy and integrity."

136. Male faculty in Professor Zelnick's department regularly engage in heated discussions. Indeed, both Professor Schneider and current Chair Craig Shepherd have lost their tempers and gotten into shouting matches with other faculty. None of these incidents has resulted in investigation or discipline.

137. BU did not permit Professor Zelnick to appeal the finding against her.

138. Dean Vigil also found Professor Schneider responsible for failing to control Professor Zelnick.

**Professor Zelnick's Internal Complaint of Discrimination and Retaliation**

139. In the Summer of 2024, Professor Zelnick filed an internal complaint of discrimination and retaliation regarding her removal from the Chair search and the disciplinary sanctions that BU imposed upon her. She named, as respondents, Dean DiChristina, Interim Provost Lutchen, and Dean Vigil.

140. BU's Equal Opportunity Office ("EOO") hired an external attorney to conduct an investigation.

141. The investigator is regularly hired by BU.

142. In the course of BU's investigation, Professor Zelnick received, for the first time, the complaints against her and materials from Dean Vigil's investigation, including notes of her interviews with witnesses and her report.

143. Had Professor Zelnick known the allegations against her at the time, she would have been able to rebut many of the factual claims against her with contemporaneous emails and testimony of witnesses who were present for the incidents in question.

144. In one case, Dean Vigil's report found that Professor Zelnick committed misconduct at a committee meeting that Professor Zelnick could have proved she did not even attend.

145. Professor Zelnick also learned that Professor Thompson, her direct supervisor, made multiple statements about her that demonstrated gender bias. He stated that, "she's smart and charismatic, which makes her dangerous."

146. Professor Thompson also made statements that were untrue and should have been red flags to the investigator and college leadership, including that Professor Zelnick had a "hit squad" that was out to get him.

147. Professor Zelnick felt that the EOO investigation was incomplete, and its outcome predetermined.

148. As in Dean Vigil's investigation, witnesses that Professor Zelnick felt were important were not interviewed during the EOO investigation.

149. Notably, BU's investigator declined to interview faculty member Tunji Akinsehinwa, who was present at every single search and committee meeting relevant to the allegations that Dean Vigil investigated. The EOO investigation contacted Professor Akinsehinwa, then withdrew the request.

150. The EOO final report, dated March 3, 2025, rejected Professor Zelnick's claims. It essentially recited the rationales that the respondents gave for their decisions, and did not evaluate the substantial evidence that those rationales were pretextual.

**2025 Annual Review**

151. On March 30, 2025, new Departmental Chair Craig Shepherd conducted Professor Zelnick's annual review.

152. Professor Shepherd previously stated that he had been "warned" about certain members of the department, including Professor Zelnick. He also noted that he had access to all of the emails sent about the Chair search, because he was not given a new email account upon hiring, but instead took over previous Chair Paul Schneider's email account.

153. Professor Zelnick's Spring 2024 review had taken note of the discipline and demotion that followed BU's retaliatory investigation, and her raise was reduced to zero as a result.

154. In Professor Zelnick's 2025 review, Professor Shepherd again held the results of the secret investigation and her demotion against her, again reducing her evaluation level.

155. Professor Zelnick's merit review meeting with Professor Shepherd was incredibly hostile, and Professor Shepherd told her that her knowledge about the department and university made him feel "schooled." When she pointed out that all the information she had was available online via Sharepoint, the college's own website, and the university's faculty handbook, he said he still felt "embarrassed."

156. Professor Shepherd criticized Professor Zelnick for not having closer relationships with the same faculty who had secretly and falsely complained about her.

157. Professor Zelnick asked if there were any problems with her teaching or service; he said no, that by all accounts she was an exceptional teacher, he just wanted her to "turn to him for guidance" more. Notably, Shepherd has no previous experience in academia or as a teacher/instructor in any capacity or any field.

158. Due to a university-wide salary freeze, the negative merit review did not immediately affect Professor Zelnick's salary, but both low evaluations would have affected it going forward when normal annual raises resumed and would have also impacted any attempt at promotion.

**BU's Treatment of Other Involved Faculty**

159. Associate Dean Jodi Luber was promoted to Senior Associate Dean during the 2024-2025 academic year.

160. Members of the search committee who acquiesced to the decision to remove Professor Zelnick from the search were rewarded for their actions.

a.  Professor Sheila Sitomer, the leader of the search committee who had acquiesced to the demand to remove Professor Zelnick, was appointed to Professor Zelnick's former position as Associate Chair.

b.  Professor Amy Geller was given a three-year contract renewal.

c.  Professor Adam Lapidus was honored with the Becker Family Teacher of the Year award for 2024 by Dean DiChristina.

d.  Professor Charlotte Howell was awarded tenure in 2024.

161.  By contrast, faculty members who had supported Professor Zelnick were penalized.

a.  Professor Gustavo Rosa, who supported Professor Zelnick and participated in the EOO investigation as a witness for her, was placed on leave, investigated, and ultimately left the university.

b.  Aaron Kopp, who vocally supported Professor Zelnick and was a witness in the EOO investigation, received only a one-year contract extension instead of the three-year extension that was typical (and that search committee member Amy Geller received), despite glowing student evaluations and an Oscar nomination.

c.  Jan Egleson, who resigned from the search committee in protest and was a witness in the EOO investigation, was initially assigned only one class for the fall 2026 semester, and was denied a request for sabbatical before retirement—all in contrast to treatment of similarly situated faculty members.

d.  Paul Schneider, who served as Chair of the department during the Chair search and who stood up to Dean DiChristina and university leadership, repeatedly requesting a review of the procedures that had eliminated me from the Chair

search, and was a witness in the EOO investigation, was stripped of his Emeritus status after retirement.

162. Following these events, Professor Zelnick believed that she had no choice but to resign, and did so on August 15, 2025, taking a lower-paid position at another university.

## COUNT I
### Gender Discrimination
### Mass. Gen. Laws ch. 151B, § 4

163. Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

164. BU is an employer of more than 6 employees in the state of Massachusetts and is subject to Mass. Gen. Laws ch. 151B.

165. BU removed Professor Zelnick from the search for a departmental Chair because of her sex.

166. BU disciplined Professor Zelnick for conduct that male colleagues engaged in with impunity, because of her sex.

167. BU's actions constitute discrimination against Professor Zelnick based on gender in violation of Mass. Gen. Laws ch. 151B, § 4(1).

168. As a result of BU's actions, Professor Zelnick suffered substantial physical, emotional, and economic harm, including but not limited to loss of wages, damage to reputation and future earning capacity, and incurred legal fees and costs.

**COUNT II**
**Retaliation**
**Mass. Gen. Laws. Ch. 151B, § 4**

169.  Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

170.  BU is an employer of more than 6 employees in the state of Massachusetts and is subject to Mass. Gen. Laws ch. 151B.

171.  Plaintiff engaged in protected activity including, but not limited to, complaining of discrimination against her in the search for a departmental Chair.

172.  Plaintiff undertook these protected activities reasonably and in good faith in order to combat wrongful discrimination.

173.  BU was aware of Plaintiff's protected activity.

174.  Because of her protected activity, BU engaged in materially adverse actions with respect to Professor Zelnick, in violation of Mass. Gen. Laws ch. 151B, § 4(4) and (4A).

175.  As a result of BU's actions, Professor Zelnick suffered substantial physical, emotional, and economic harm, including but not limited to loss of wages, damage to reputation and future earning capacity, and incurred legal fees and costs.

**COUNT III**
**Gender Discrimination**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e-2(a)(1)**

176.  Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

177.  BU is an employer of more than 15 employees and is subject to Title VII.

178. BU removed Professor Zelnick from the search for a departmental Chair because of her sex.

179. BU disciplined Professor Zelnick for conduct that male colleagues engaged in with impunity, because of her sex.

180. BU's actions constitute discrimination against Professor Zelnick based on gender in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1).

181. As a result of BU's actions, Professor Zelnick suffered substantial physical, emotional, and economic harm, including but not limited to loss of wages, damage to reputation and future earning capacity, and incurred legal fees and costs.

### COUNT IV
**Retaliation**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e-3(a)**

182. Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

183. BU is an employer of more than 15 employees and is subject to Title VII.

184. Plaintiff engaged in protected activity including, but not limited to, complaining of discrimination against her in the search for a departmental Chair.

185. Plaintiff undertook these protected activities reasonably and in good faith in order to combat wrongful discrimination.

186. BU was aware of Plaintiff's protected activity.

187. Because of her protected activity, BU engaged in materially adverse actions with respect to Professor Zelnick, in violation of Title VII, 42 U.S.C. § 2000e-3(a).

188. As a result of BU's actions, Professor Zelnick suffered substantial physical, emotional, and economic harm, including but not limited to loss of wages, damage to reputation and future earning capacity, and incurred legal fees and costs.

**COUNT V**
**Gender Discrimination**
**Title IX**
**20 U.S.C. § 1681**

189. Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

190. BU is an educational institution that receives federal funding and is subject to Title IX.

191. BU removed Professor Zelnick from the search for a departmental Chair because of her sex.

192. BU disciplined Professor Zelnick for conduct that male colleagues engaged in with impunity, because of her sex.

193. BU's actions constitute discrimination against Professor Zelnick based on gender in violation of Title IX.

194. As a result of BU's actions, Professor Zelnick suffered substantial physical, emotional, and economic harm, including but not limited to loss of wages, damage to reputation and future earning capacity, and incurred legal fees and costs.

**COUNT VI**
**Retaliation**
**Title IX**
**20  .S.C. § 1681**

195. Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

196. BU is an educational institution that receives federal funding and is subject to Title IX.

197. Plaintiff engaged in protected activity including, but not limited to, complaining of discrimination against her in the search for a departmental Chair.

198. Plaintiff undertook these protected activities reasonably and in good faith in order to combat wrongful discrimination.

199. BU was aware of Plaintiff's protected activity.

200. Because of her protected activity, BU engaged in materially adverse actions with respect to Professor Zelnick, in violation of Title IX.

201. As a result of BU's actions, Professor Zelnick suffered substantial physical, emotional, and economic harm, including but not limited to loss of wages, damage to reputation and future earning capacity, and incurred legal fees and costs.

## COUNT VII
### Massachusetts Equal Rights Act (G.L. c. 93, § 102)

202. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

203. In deciding to discipline Plaintiff, and taking other adverse actions, BU treated Plaintiff more harshly and less favorably than other comparable faculty.

204. Based on the totality of circumstances, BU discriminated against Plaintiff and deprived her of contractual benefits because of her gender.

205. In so doing, BU deprived Plaintiff of her right to make and enforce contracts equally, in violation of the Massachusetts Equal Rights Act.

206. As a result of BU's unlawful actions, Plaintiff suffered the harms described above.

## COUNT VIII
### Breach of Contract

207. Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

208. BU's actions set forth above constitute breach of contract.

209. BU's policies, including but not limited to its policies on hiring, faculty handbook, Code of Ethical Conduct, and policy on Academic Freedom, afforded Professor Zelnick, as a member of the BU faculty, rights that are contractual in nature.

210. As a private institution, BU had a duty to provide Professor Zelnick with a minimum level of basic fairness when investigating and disciplining her.

211. BU violated Professor Zelnick's contractual rights:

    a. when it singled her out and removed her from the Chair search, while permitting less qualified external applicants to proceed, despite its policy that internal and external applicants should be treated the same;

    b. when it commenced an investigation and disciplined her absent an allegation that she had violated any BU policy, for alleged conduct that the Code of Ethical Conduct did not forbid;

    c. when it denied her basic fairness, adequate notice, and an opportunity to be heard in its investigation;

    d. when it acted arbitrarily and capriciously in imposing discipline upon her; and

    e. when it disciplined her for activities as to which its policies promised her academic freedom.

212.  As a direct and proximate result of that breach, Plaintiff suffered damages including but not limited to loss of wages, damage to reputation and future earning capacity, and incurred legal fees and costs.

## COUNT IX
### Breach of the Duty of Good Faith and Fair Dealing

213.  Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

214.  Good faith and fair dealing are implied in all contracts.

215.  Neither party to a contract shall do anything that will have the effect of destroying or injuring rights of the other party to receive the fruits of the contract.

216.  BU breached that covenant by depriving Professor Zelnick of basic fairness and by pursuing its investigation and adjudication in an unfair and biased manner.

217.  As a direct and proximate result of that breach, Plaintiff suffered the harms described above.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant Boston University on all counts of this complaint. Plaintiff further requests that the Court order:

1.  That Plaintiff be compensated for any loss of wages and/or benefits, damage to reputation and earning capacity, incurred as a result of Defendant's unlawful acts;

2.  That Plaintiff be awarded an amount of money that will fairly compensate her for the emotional and physical pain and suffering caused by Defendant's unlawful acts;

3.  That Defendant pay Plaintiff's costs and attorneys' fees resulting from this action;

4.    That Defendant pay Plaintiff interest on any judgment entered from the time of the filing of this suit at the MCAD;

5.    That Defendant pay Plaintiff punitive damages; and

6.    That Defendant to pay such relief as may be just and proper and/or that will make Plaintiff whole.

7.    Any other and further relief that this Court deems equitable and just.


PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.


Respectfully Submitted,
Marni Zelnick,
By her attorney,

/s/ Ruth O'Meara-Costello _____
Ruth O'Meara Costello (BBO# 667566)
Law Office of Ruth O'Meara-Costello
875 Massachusetts Ave., Suite 31
Cambridge, MA 02139
617-658-4264
ruth@ruthcostellolaw.com

Dated: February 17, 2026